United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCO VILLAPUDA VILLA,

    Petitioner,

    v.

ROBERT H. TRIMBLE, warden,

    Respondent.

                                       /

No. C 12-1176 SI (pr)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Marco Villapuda Villa filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Following a jury trial in Monterey Country Superior Court, Villa was found guilty of torture, residential burglary with personal infliction of great bodily injury, assault with personal infliction of great bodily injury, simple assault, battery, false imprisonment, and two counts of dissuading a witness. He was sentenced to 13 years to life in state prison. The California Court of Appeal described the evidence at trial in depth.

A.   Introduction

Victims Jose Hernandez and Sergio Cabrera resided together in the City of Monterey. Ortiz and Villa shared an apartment in the City of Marina. Both Hernandez and Cabrera knew Ortiz from a restaurant where they worked together. One day at work, Ortiz told Hernandez that $15,000 was missing from his apartment and that a person named Douglas (his full name was never ascertained at trial) had stolen it. Douglas had been staying with Ortiz but had disappeared right after Ortiz discovered the money was missing. Ortiz wanted to know if Hernandez knew where Douglas was. Hernandez told him that he did not know.

Three days before the crimes charged in this case, Ortiz came to the victims' apartment and asked Cabrera if he knew where Douglas was. Cabrera learned from Hernandez that Ortiz and Villa were looking for Douglas because Douglas had stolen their money and drugs.

B.   Beating Hernandez

About a month prior to the charged crimes, Hernandez had borrowed $200 from Ortiz. He was to pay him back when he got his paycheck. On Monday, February 18, 2008, Ortiz came to the victims' apartment to give Hernandez a ride to cash his paycheck so he could repay Ortiz the money he owed. They left together around 1:00 p.m. Hernandez cashed the check at a market in Marina. He received $565 and gave $200 to Ortiz. Ortiz then drove to his own apartment and invited Hernandez inside. Inside the apartment Villa was lying on the sofa; Hernandez sat down on the edge. Ortiz then locked the door; he looked upset. He told Hernandez, "I'm going to fuck you up." He accused Hernandez of knowing where Douglas was but Hernandez denied it.

Ortiz hit Hernandez in the face with his fists. Villa got up, put on his shoes, and came toward Hernandez and, together with Ortiz, threw Hernandez to the floor. Hernandez lay on his back while Ortiz punched him in the eyes and mouth. Villa hit him on the forehead. They held him down and Hernandez did not fight back. Ortiz asked him repeatedly where Douglas was; Hernandez repeatedly denied knowing. Ortiz told Hernandez that Douglas had stolen drugs and $15,000. Villa said some of the money had belonged to him. Villa said nothing about drugs.

The beating continued for about one-half hour. Villa threatened to kill Hernandez. Ortiz "was pretty much following whatever [Villa] was saying at the moment." For example, "[Villa], he was threatening me that he would kill me, and [Ortiz] would say yeah." Villa told Hernandez that he was going to tape his mouth and hands and leave him locked up. Hernandez believed the threats. He was afraid he might die because they were "self-assured about stuff like that." Hernandez saw Villa with a switchblade knife. When Villa tried to cut Hernandez, Hernandez put his hand in the way and got his finger cut. Hernandez kicked the walls and window blinds trying to alert the neighbors.

Defendants finally stopped the beating. The skin around Hernandez's teeth was broken, his eye was swollen, his jaw moved sideways, and his face, head and chest hurt. During the course of the beating, Ortiz took $300 from Hernandez's pocket.

C.   Kidnapping Hernandez

Villa gave Hernandez a sweatshirt to cover the blood on his shirt and the two defendants forced him into the car. They told Hernandez they were going to his place in Monterey to "fuck up" Cabrera and would hit him harder than they had hit Hernandez.

2

They told Hernandez that they were going to lock him inside the car and that they would kill him if he told anyone at the restaurant or if he said anything to the police. In the car, Ortiz was behind the wheel, Villa sat in the front passenger seat, Hernandez was in the back. On the way to Monterey they picked up Marlon Guillen. Guillen got in the back seat with Hernandez. Defendants told Guillen to keep an eye on Hernandez to keep him from escaping.

D.   Beating of Cabrera

On the way to the victims' apartment in Monterey, Ortiz described his plan. Ortiz would go up to the door. Villa was to follow as soon as Ortiz was inside. Before they got to the apartment Ortiz received a call from Cabrera looking for Hernandez and asking Ortiz to pick up a six-pack of beer for him. Ortiz stopped for the beer, then went on to the apartment and parked in front. Defendants told Hernandez not to get out of the car or they would find him and kill him.

Cabrera testified that Ortiz opened the door to the apartment, walked directly over to where Cabrera was sitting, and, with a little smile on his face, started punching Cabrera in the head. Villa came in a minute or two after Ortiz entered. Villa pushed Cabrera, face-down, onto the floor. Cabrera's face and nose were bleeding. Villa put his knee on the back of Cabrera's head and shifted all his weight on to that knee. Cabrera lost "concentration" and felt dizzy. He could not breathe and thought he might die. While Cabrera was lying there bleeding defendants tied his hands behind him with a telephone cord. Cabrera recalled having been punched many times, mostly by Ortiz, but Villa punched him two or three times as well. All the punches were to his face. The beating lasted about 20 minutes. Ortiz twice asked Cabrera where Douglas was. Villa did not say anything. Defendants untied Cabrera before they left.

After defendants left the apartment, Cabrera got up. He was dizzy and weak and could not open the front door. The police arrived five to 10 minutes later. Cabrera did not recall much of what happened right after the beating. Both sides of his face were swollen. His eyes were "closing" and bleeding, his head hurt, and he had "no energy." A day or two later, Cabrera went to a doctor because he was having bad headaches and was afraid his head was damaged. The ear, nose, and throat specialist who examined Cabrera on February 22, 2008, noted that a CT scan taken on the day of the beating showed that the upper bony portion of Cabrera's nose and the right eye socket bone (the orbital bone) were fractured. The fractures did not require treatment and would heal on their own. The fractured eye socket might have been causing the headaches by allowing air to enter the sinuses under the facial bones. The doctor had "no way to know" what caused the fractures other than what the patient might tell him. The fractures were consistent with the patient's having been hit with a fist.

E.   Law Enforcement Investigation

While defendants were inside the victims' apartment beating Cabrera, Hernandez did not stay put. He got out of the car and ran to a nearby fire station. Monterey Police Officer Carrie Hogan was dispatched to the fire station where she found Hernandez with facial injuries. He was distraught. She called for an officer to go to the victims' apartment.

Monterey Police Detective Amy Carrizosa responded and contacted Cabrera at his apartment sometime between 4:00 and 4:30 p.m. on February 18, 2008. Cabrera had cuts, bruises, and swelling all over his face. When she observed him two days later, his face was still bruised and swollen, his lip was swollen and cut, both ears were bleeding and cut, she felt bumps on his head, and his left eye had swollen shut.

> During her first interview with Cabrera on the day of the incident, he told her that defendants "had come and were looking for a man, who he later determined was Douglas, because [Douglas] had stolen drugs and/or money from them." He told her that defendants had threatened to kill him and warned that they would kill him if he went to the police. (During his testimony at trial, Cabrera denied that defendants threatened to kill him or told him not to go to the police.)
>
> The day after the incident, the police executed a search warrant at defendants' apartment. Ortiz, Villa, and Guillen were inside. The police found over $3,000 in cash in Ortiz's bedroom and three $100 dollar bills in his wallet. No drugs, drug paraphernalia, or indicia of drug sales were found in the apartment. No switchblade knife was found.
>
> F.   Defense Case
>
> Villa testified in his defense, claiming that Douglas had stolen money and a computer, not drugs. He also maintained that he, Villa, had walked in on the two beatings and that in both instances he did not join in but tried to pull Ortiz off his victims. Ortiz did not testify. Both defendants focused upon inconsistencies in the victims' stories.

Cal. Ct. App. Opinion, ¶. 2-6.

After his conviction was affirmed on appeal and his petition for review was denied, Villa filed this action. The court issued an order to show cause why the petition should not be granted. Respondent filed an answer and Villa filed a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

## DISCUSSION

Villa alleges three claims. First, he alleges the torture conviction violated his right to due process because there was insufficient evidence to prove a specific intent to inflict extreme and prolonged pain. Second, Villa alleges the finding of personal infliction of great bodily injury

5

violated his right to due process because there was insufficient evidence to prove that his actions resulted in Cabrera's injuries. Third, he claims the jury instructions relieved the prosecution of its burden of proof with regard to liability for a group beating.

A.  Sufficiency of The Evidence

   1.  Sufficiency of the Evidence of Torture of Cabrera

Under California law, torture has two elements: (1) the infliction of great bodily injury on another, and (2) the specific intent to inflict cruel or extreme pain and suffering for revenge, extortion or persuasion or any sadistic purpose. *People v. Baker*, 98 Cal. App. 4th 1217, 1223 (2002) (citing Cal. Penal Code § 206). "Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense." *Id.*

Villa challenges the second element. Villa contends that, while there was evidence that he caused injuries to Cabrera, there was insufficient evidence that he inflicted the injuries with the necessary specific intent rising to the level of "torture" as defined under California law. He argues that this element was not proven because circumstances commonly found in torture cases were not present in his case. He also argues that no earlier case upheld a torture conviction where there was only a brief beating with fists and where scarring, disfigurement, excruciating pain, or long-term pain were absent.

The California Court of Appeal rejected Villa's challenge to the sufficiency of the evidence for the conviction of torture:

> Defendants insist that "prolonged pain" is an essential element of the crime of torture and, because the attack upon Cabrera was not as prolonged as the attacks in other torture cases, it cannot have been torture. Relying upon a number of cases in which the assault at issue was more prolonged than the 20-minute attack that took place here, defendants maintain that the "brief assault with fists" is insufficient to support the torture convictions. We disagree. In the context of the crime of torture, the jury may rely upon circumstances of the crime to decide whether a defendant had the intent to inflict cruel or extreme pain and suffering, but no one circumstance is determinative. "Torture does not require the defendant act with premeditation and deliberation, and it does not require that he intend to inflict prolonged pain. [Citation.] Accordingly, the length of time over which the offense occurred is relevant but not necessarily determinative. [Citation.] Likewise, the severity of the wounds inflicted is relevant but not necessarily

6

determinative." (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.) Another circumstance from which a jury may infer intent to cause extreme pain or suffering is where a defendant "'focuses his attack on a particularly vulnerable area, such as the face, rather than indiscriminately attacking the victim.'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426-1427; see *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1163; cf. *People v. Crittenden* (1994) 9 Cal.4th 83 [multiple stab wounds sufficient evidence of torture].) More generally, the analysis requires the jury to distinguish between acts committed as part of an indiscriminate "explosion of violence" and acts committed with the specific purpose of causing the victim to suffer cruel or extreme pain and suffering for one of the purposes specified in section 206. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) While defendants dwell upon a number of cases where the facts were more egregious than they are here, our concern is whether the circumstances of this case support the jury's findings. We believe they do.

The evidence supports a finding that the attack upon Cabrera was part of a plan; it was not a spontaneous explosion of fury. Defendants told Hernandez they were going to beat Cabrera. Ortiz sketched out the process to Villa. Once in the apartment, defendants did not approach Cabrera with unfocused fury. Ortiz was smiling. He immediately punched Cabrera in the face multiple times. Villa landed a couple of punches and helped pull Cabrera to the floor and pinned him there by kneeling on his head.

Defendants argue that their lack of intent to cause extreme pain and suffering is shown by evidence that Cabrera's wounds were not severe, he was not scarred or disfigured, and he did not suffer extreme pain. The jury was justified in taking a different view. Defendants did not punch the man just once or twice. They punched him multiple times, focusing their blows on his face. Cabrera testified that all the blows were to his face. As the Attorney General stresses, Villa then kneeled on Cabrera's head, pressing his bleeding face into the floor so that he could not breathe. Cabrera thought he was going to die. His head was immobilized and his hands were bound behind his back. Defendants kept him from breathing for long enough that he lost "concentration." The jury would have been justified in understanding this to mean that he passed out. When he was finally let go he was so dizzy and weak he could not open the front door. The jury could reasonably have concluded from evidence of the many blows to the face and the sadistic manner in which the victim was pinned to the floor that defendants intended to cause him extreme pain and suffering.

Villa argues that there must be some link between the conduct demonstrating intent to torture and infliction of great bodily injury. He also maintains that there is no evidence that his pinning Cabrera's face to the floor resulted in great bodily injury to Cabrera. It follows, he says, that he cannot be guilty of torture. The main problem with the argument is that evidence of Villa's conduct in kneeling on Cabrera's head was only one of the several circumstances that, taken together, support the jury's finding that defendants had the intent to cause extreme pain and suffering. It does not matter which of the several circumstances supporting the intent finding actually resulted in the great bodily injury so long as the evidence supports a finding that defendants harbored the requisite intent when the great bodily injury was inflicted. Viewed as a whole, the evidence supports the finding that defendants intended to cause extreme pain and suffering for the purpose of revenge or persuasion when they beat Cabrera, bound his hands, and pinned him face down on the floor, and that somewhere in the course of that attack, defendants inflicted great bodily injury upon the victim. That is sufficient to support the torture convictions.

Cal. Ct. App. Opinion, ¶. 9-12.

The Due Process Clause "protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. The reviewing court must presume that the trier of fact resolved any conflicts in the evidence in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326. The Ninth Circuit has explained that "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. . . . Nevertheless, 'mere suspicion or speculation cannot be the basis for creation of logical inferences.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). Under AEDPA, the question is whether the state court's application of the *Jackson* standard was objectively unreasonable. *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam). To grant relief, therefore, a federal habeas court must conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-965 (9th Cir. 2011).

A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam). A habeas petitioner may not transform a state law issue into a federal one merely by asserting a due process violation. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). Similarly, a petitioner is not permitted to restate his state law claim as a federal constitutional challenge to the sufficiency of the evidence. The decision in *Curtis v. Montgomery*, 552 F.3d 578, 582 (7th Cir. 2009), illustrates this point. In *Curtis*, the state appellate court had upheld an aggravated stalking conviction for a defendant who was arrested as he approached the

victim's car, and had determined that the state statute did not require the defendant be present near his victim for a minimum period of time in order to satisfy the element that he place the victim under surveillance by remaining present near her home, office or vehicle. The petitioner challenged his aggravated stalking conviction by claiming insufficient evidence because the State did not prove beyond a reasonable doubt that he "remained present" outside of the victim's vehicle. *Id.* at 581. The Seventh Circuit concluded the petitioner was "impermissibly attempting to use a petition for writ of habeas corpus to press his preferred interpretation of Illinois law." *Id.* at 582.

Villa is essentially attempting to use a petition for a writ of habeas corpus to push his preferred interpretation of the elements of torture under California law. Here, the evidence was sufficient to satisfy the element of intent to inflict cruel or extreme pain and suffering. Villa entered Cabrera's apartment shortly after Ortiz entered. Villa pushed Cabrera to the floor, and punched him in the face multiple times. He also kneeled on his head, shoving Cabrera's bleeding face into the floor causing Cabrera to be unable to breath. Cabrera "lost concentration" and felt as if he was going to die. Villa concedes that the evidence was sufficient to show the beating was inflicted to persuade Cabrera to provide information. Docket #1-1, p. 12. The punches were specifically aimed at Cabrera's face, a particularly vulnerable area, and supported the inference that there was a specific intent to inflict extreme and prolonged pain.

Villa's ability to find cases in which the torture convictions were based on more violent actions by the defendants or worse damage to the victims does not mean that the evidence was legally insufficient to support his conviction.[1] What he needed to find, but did not, was any California case in which a court found the evidence insufficient to support a torture conviction where the facts were similar to or more egregious than his. Although there are no published California cases factually similar to Villa's, the California Court of Appeal reasonably determined

---

[1] Villa also identifies cases in which beatings similar to the one he inflicted were charged as assaults. Those cases do not support a determination that the evidence of torture was insufficient in his case. The prosecutors' charging decisions in other cases simply do not matter to the sufficiency of the evidence analysis in this case.

9

1 that the circumstances of the beating supported the jury's determination that Villa had the
2 requisite intent to cause cruel or extreme pain and suffering. As that court explained, the "many
3 blows to the face and the sadistic manner in which [Cabrera] was pinned to the floor," in
4 combination with the planned nature of the beating, provided sufficient evidence on the intent
5 element. Cal. Ct. App. Opinion, ¶. 10-11. The California Court of Appeal's rejection of the
6 challenge to the sufficiency of the evidence was not contrary to or an unreasonable application
7 of *Jackson v. Virginia*. Villa is not entitled to the writ on this claim.

### 2. Sufficiency of the Evidence of Great Bodily Injury Enhancement

Villa received a stiffer sentence because the jury found he inflicted great bodily injury on Cabrera. *See* Cal. Penal Code § 12022.7. Villa argues that the evidence for the great bodily injury enhancement was insufficient because it did not fall in line with the "group beating" principle explained in *People v. Modiri*, 39 Cal.4th 481, 494 (2006), for determining whether he has liability for inflicting great bodily injury. A defendant who participated in a group beating may be found to have inflicted great bodily injury only when ""'it is not possible" to determine which assailant inflicted a particular injury' and the defendant commit[ed] 'acts that contribute[d] substantially to the victim's injured state.'" *Id*. CALJIC No. 17.20 clarifies that the infliction of physical force by a defendant "must have been sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants." *Id.* Villa claims there was no evidence linking the injuries to Cabrera's face being shoved onto the floor. He also points out that Cabrera was never asked and never testified who threw the punches that caused the injuries. Villa urges the record does not support the conclusion it was impossible to determine the precise manner in which the injuries occurred.

The California Court of Appeal applied the law to reject Villa's insufficient evidence claim for the great bodily injury enhancement:

> Villa argues that he did not "participate substantially" in beating Cabrera and, for that reason, this case is distinguishable from the many cases finding substantial evidence to support the personal-infliction finding in a group beating case. As with the torture conviction, we are concerned here with the evidence in this case, evaluating it by means

10

> of the substantial evidence standard of review. Although Villa implies that his participation was not substantial since Ortiz did most of the punching, Villa ignores an important part of the evidence. Villa entered the fray within minutes, punched Cabrera two or three times, wrestled him to the floor, then kneeled on his head, pressing the victim's face into the floor with the weight of his body. Ortiz may have landed a greater number of punches but Villa's role was not insubstantial in comparison.
>
> Both defendants argue that the prosecutor failed to prove that it was impossible to tell who inflicted the great bodily injury because he did not ask Cabrera if his nose was already bleeding and if his eye had already been struck by the time Villa joined the fight. Defendants also maintain that the prosecution failed to ask Cabrera where Villa's two or three punches landed. Certainly, if the prosecutor had asked those questions, Cabrera's answers may have buttressed the impossibility element. But since the argument on appeal pertains to the sufficiency of the evidence, we look to the record as it stands to see if the evidence is sufficient to prove the negative. The physician who examined Cabrera testified that there is "no way to know" how either fracture occurred. It could have been a fist-but whose fist? Did the fracture occur on the first blow or as the cumulative effect of more than one blow? Did jamming Cabrera's face into the rug and then kneeling on his head cause or contribute to one or both of the fractures? The medical testimony was that, judging solely from the fractures, there is no way to know what caused them. Cabrera's description of the rapidity with which he was set upon, the number of blows he suffered, and the manner in which he was pinned to the floor, support the finding that either defendant could have caused one or both of the fractures and that it is not possible to ascertain which particular act caused which fracture.
>
> . . .
>
> In this case, the medical evidence is that one cannot tell from the fractures how they were inflicted. And, unlike *Magana*, there is no suggestion that the prosecution could have proved which defendant caused which injury in some other way. Defendants' argument presumes that if Cabrera had testified that his nose was bleeding and his eye had been struck before Villa joined the fight, then we would know who caused the fractures. But defendants provide no support for the propositions that any one blow to the eye would necessarily fracture the orbital bone or that a bloody nose is an unequivocal sign that the bony upper portion of the nose is broken. Accordingly, unlike the situation in *Magana*, it is not the case that the prosecution had evidence that would have made it possible to tell which defendant inflicted both injuries. Since both defendants personally applied force sufficient to produce great bodily harm to Cabrera, and since the precise manner in which they contributed to the victim's injuries cannot be measured or ascertained, the evidence is sufficient to support the jury's finding that they both personally inflicted the injury.

Cal. Ct. App. Opinion, ¶. 12-15.

The *Jackson v. Virginia* standard applies to state sentence enhancements: a petitioner can obtain habeas relief if no rational trier of fact could find the elements of the enhancement true beyond a reasonable doubt. *Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2005). Under California law, the jury must find that (1) the defendant applied unlawful physical force to the victim, (2) the force applied by the defendant was sufficient to produce great bodily injury either alone or in combination with the force of other assailants, and (3) it is impossible to know which

assailant inflicted which injury. *Modiri*, 39 Cal.4th 481 at 493. The third prong is unusual in that it requires evidence to establish a negative; that is, group beating liability attaches only if the evidence shows that it is impossible to determine which of the two assailants inflicted a particular injury. Villa doesn't dispute the first two prongs of the test, i.e., he accepts that there was evidence to support the findings (1) that he applied unlawful physical force to Cabrera and (2) that the force he applied was sufficient to produce great bodily injury either alone or in combination with Ortiz's force. His focus is on the third prong, yet he fails to show why the jury could not have found it was impossible to determine who caused the fracture. He does not point to any evidence that precluded the jury from finding that it was impossible to know which assailant caused Ortiz's fractures. Nor does he point to the evidence that shows that one particular blow caused the fractures. Nor does he point to evidence that it was Cabrera's actions alone that caused the fractures. In short, there was sufficient evidence that it was impossible to determine which of the assailants caused the fracture.

Like *Modiri*, where the victim could not see the faces of most of his assailants but was sure the defendant hit him, Cabrera could not determine who inflicted which blows, but was sure both defendants hit him with fists. That evidence plus the evidence that Villa "kneeled on [Cabrera's] head, pressing [Cabrera's] face into the floor with the weight of his body" was sufficient to support the force applied by the defendant was sufficient to produce great bodily injury either alone or in combination with Ortiz. Cal. Ct. App. Opinion, p. 13.

The sufficiency of the evidence analysis does not delve into what the prosecutor should have asked but whether evidence presented to the jury reasonably supported a jury finding that it was not possible to tell who broke Cabrera's nose and/or orbital bone. The state court focused properly on that question. Cal. Ct. App. Opinion, p. 13 ("we look to the record as it stands to see if the evidence is sufficient to prove the negative.") Villa cannot demonstrate the state court unreasonably determined that the jury reasonably could have found that it was impossible to tell who broke Cabrera's nose and/or orbital bone. Ortiz may have landed more punches to Cabrera's face but Villa's involvement was not trivial. No evidence showed which assailant caused the

1  injuries and the doctor could not find the precise causation of the fractures.  Villa both punched
2  Cabrera and kneeled on his head, shoving Cabrera's face into the carpet with the full weight of
3  his body, whereas Ortiz punched Cabrera, albeit more often than Villa did.  The state court
4  reasonably found sufficient evidence to support the jury's finding that Villa inflicted great bodily
5  injury under a group beating theory.

### B.     Instructional Error Claim

Villa challenges the "group beating" instruction (CALCRIM 3160).[2] Villa claims here, as he did on appeal in state court, that his right to due process was violated because the trial court

---

[2] CALCRIM No. 3160, as given here, was as follows:

If you find the defendant guilty of the crimes charged in Counts 5 [burglary], 7 [assault], or 12 [dissuading a witness] ... you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Sergio Cabrera during the commission of that crime, and that allegation is alleged as to each defendant.

Great bodily injury means significant or substantial physical injury. It is any - it is an injury that is greater than minor or moderate harm.

If you conclude that more than one person assaulted Sergio Cabrera and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Sergio Cabrera if the People have proved that:

1. Two or more people, acting at the same time, assaulted Sergio Cabrera and inflicted great bodily injury on him;

2. The defendant personally used physical force on Sergio Cabrera during the group assault;
AND

3A. The amount or type of physical force the defendant used on Sergio Cabrera was enough that it alone could have caused Sergio Cabrera to suffer great bodily injury;
OR
3B. The physical force that the defendant used on Sergio Cabrera was sufficient in combination with the force used by the others to cause Sergio Cabrera to suffer great bodily injury.

The defendant must have applied substantial force to Sergio Cabrera. If that force could not have been caused - if that force could not have caused or contributed to the great bodily injury, then it was not substantial.

The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

13

did not instruct the jury that the prosecutor had the burden of proving beyond a reasonable doubt that it could not be determined which defendant inflicted the broken nose and broken orbital bone suffered by Cabrera. Villa argues that a jury would have reasonably understood the instruction to mean that that the burden of proof applied only to the three elements listed and not to a fourth unlisted element, i.e., that group beating liability attached only if the jury "cannot decide which person caused which injury[.]" Villa claims that a jury would reasonably conclude no party had the burden of proving this element, and the prosecutor's burden only applied to the three listed elements. This according to Villa, deprived him of his due process right to have every element of a crime or enhancement proven beyond a reasonable doubt. *See Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993).

The California Court of Appeal rejected Villa's claim that the trial court had erred in omitting the instruction. The state appellate court further held that, even assuming the prosecution had the burden of proof on the "impossibility finding," the trial court's failure to modify CALCRIM 3160 or to give a special instruction was harmless.

> There is no dispute that the jury was amply and correctly instructed in the prosecution's overall burden to prove its case beyond a reasonable doubt. The problem, according to defendants, lies in an ambiguity in CALCRIM No. 3160, which, as given by the trial court here, states, "If ... you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury" (italics added) if the prosecution proved each of the other Modiri elements. The instruction ended with the caution, "The People have the burden of proving each allegation beyond a reasonable doubt." Defendants maintain that, as phrased, the two parts of the instruction do not make it clear that impossibility is one of the elements that the prosecution must prove beyond a reasonable doubt. Assuming that the prosecution had the burden to prove the negative proposition as defendants maintain, we conclude that the trial court's failure to modify CALCRIM No. 3160 or to give a special instruction on the point was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24.) We concluded above that the evidence is sufficient to support the impossibility finding. We have further concluded that there was no indication that Cabrera could have provided any evidence to the contrary. There is nothing in the record or in defendants' arguments to suggest that the jury could have reached any different result. Accordingly, we are convinced beyond a reasonable doubt that the error, if any, was harmless.

Cal. Ct. App. Opinion, p. 16.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Federal habeas relief is available for the omission of a jury instruction only if the error

14

"'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *Id.* at 72 n. 4. Therefore, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.

If a constitutional error is found in the omission of an instruction, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears a difficult burden. *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997). The habeas court must apply the harmless-error test set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623). Where the trial court simply fails to alert the jurors that they must consider an element of the crime, the omission is harmless if review of the facts found by the jury establishes beyond a reasonable doubt that the jury necessarily found the omitted element. *California v. Roy*, 519 U.S. 2, 4 (1996).

The California Court of Appeal's rejection of Villa's instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. Villa challenges CALCRIM 3160 on the grounds of an ambiguity within the language. Here, the questioned part of CALCRIM 3160 must be assessed in the context of the instructions as a whole and the trial record. Applying the jury instructions in the context of the

trial record, the jury could have reasonably concluded that it was not possible to know who caused which injuries. The medical testimony does not indicate otherwise. While Villa contends the wrong harmless error test was used, the *Brecht* standard applies here because it is the proper test on habeas. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

Villa's instructional error claim fails under both an omission analysis and an ambiguous jury instruction analysis. Regarding ambiguity, there was no reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. The omission, if any, did not substantially and injuriously influence the jury's verdict and was harmless because a review of the facts found by the jury establishes beyond a reasonable doubt that the jury *necessarily* found the omitted element of the impossibility determination. The failure to explicitly instruct that the prosecutor had to burden to prove that it was impossible to determine which assailant inflicted which injury did not so infect the trial as to make it a denial of due process. Villa is not entitled to a writ on this claim.

## C.     No Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## CONCLUSION

The petition for writ of habeas corpus is denied on the merits. The clerk will close the file.

IT IS SO ORDERED.

DATED: February 8, 2013

SUSAN ILLSTON
United States District Judge